IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**MARY ANN FARMWALD,**

        **Plaintiff,**

v.                                        Civil Action 2:20-cv-4148
                                          Magistrate Judge Kimberly A. Jolson

**COMMISSIONER OF**
**SOCIAL SECURITY,**

        **Defendant.**

## OPINION AND ORDER

Plaintiff, Mary Ann Farmwald, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB"). The parties in this matter consented to the Undersigned pursuant to 28 U.S.C. § 636(c). (Docs. 5, 6). For the reasons set forth below, the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner's decision.

**I.**      **BACKGROUND**

Plaintiff protectively filed her application for DIB on February 17, 2016, alleging that she was disabled beginning September 4, 2007, due to memory issues, seizures, depression, back pain at L5/S1, multiple levels of narrowing in her neck, numbness and tingling in her arms and legs, and feet pain from plantar fasciitis and Achilles tendonitis. (Tr. 171–77, 206). After her application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a video hearing on January 8, 2019. (Tr. 45–88). The ALJ denied benefits in a written decision on January 18, 2019. (Tr. 21–43). That became the final decision of the Commissioner when the Appeals Council denied review. (Tr. 6–11).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on August 13, 2020 (Doc. 1), and the Commissioner filed the administrative record on January 22, 2021 (Doc. 13). Plaintiff filed her Statement of Errors (Doc. 16) on March 22, 2021, and Defendant filed an Opposition (Doc. 17) on April 28, 2021. Plaintiff filed her Reply on June 7, 2021 (Doc. 20). Thus, this matter is now ripe for consideration.

### A. Relevant Hearing Testimony

The ALJ summarized the testimony from Plaintiff's hearing:

> The [Plaintiff] testified being unable to work during the relevant period due to the combined effects of her conditions, including difficulty concentrating and focusing, memory issues, back pain, and seizure activity. She testified that her husband, mother-in-law and sister-in-law helped her with most daily activities during the two[-]week period each month before and after her menses cycle, as that was when she generally experienced seizures.
>
> The [Plaintiff] testified that she required assistance with her son the week before and during her menses cycle due to such reported episodes of "spacing out."

(Tr. 30–31).

### B. Relevant Medical Evidence

The ALJ summarized the relevant medical records:

> The [Plaintiff] has a history of an intracranial hemorrhage predating the relevant period; thereafter she began experiencing seizures as well, noted in the record as 2004 (Ex 16F:25-27). An MRI scan was performed in February 2007, about seven months before the alleged onset date, due to a breakthrough grand mal seizure and her medical history. The findings did not indicate any further hemorrhage or new lesion (Ex 16F:29-30).
>
> The [Plaintiff] did not experience another seizure for over a year thereafter, and there are no treatment notes until such next seizure, which is about 10 months after the alleged onset date. At that time[,] she presented to the emergency department in July 2008 (Ex 2F:37, 54-57). She reported an ongoing headache after a seizure. The [Plaintiff] also stated that she had been off her seizure medication for over a year and that she had not sought evaluation or follow up with a neurologist in approximately one year (*Id.*). Notes indicate that she was then restarted on antiseizure medication (*see* Ex 2F: 11, 29). A CT scan of the head showed a small hemorrhage in the right parietal lobe (Ex 2F:37).

The record indicates that a cavernoma was then discovered (Ex 2F:11, 29, 99-100, *see also* Ex 23F:4). In September 2008, during the pre-operative consultation, the seizures were described as being under control with medication (Tegretol) (*Id.*). I note that the only medication the [Plaintiff] was taking at that time was the Tegretol and a multivitamin.

The [Plaintiff] underwent a right parietal craniotomy with excision of cavernoma in September 2008 (Ex 2F:54). She then experienced another grand mal seizure the week after her brain surgery, in September 2008; however, she has not experienced another grand mal seizure since that time (Ex 2F:33, 58-59 and hearing testimony). She does, however, testify that she continues to experience seizure activity that limits her ability to function the before and during her menses cycle. During such reported seizures the [Plaintiff] states that she is aware of what is happening around her and she does not lose consciousness, however, she "spaces out" and is unable to form sentences. She also testified that after such an episode she feels tired for a day or two. While there are no records directly relating to this period to indicate the [Plaintiff]'s level of activity, notes in April 2009 state that the [Plaintiff] had been leading an active life (*see* Ex 2F:22).

Subsequent follow up testing showed a normal brain other than the noted stable post-surgical changes (Ex 2F:113). A follow up note dated October 2010 documents that the [Plaintiff] has had no seizure activity since 2008 and that she remains on Tegretol (Ex 23F: 10). The treating neurosurgeon, Rebecca Brightman MD, indicated that the [Plaintiff] was experiencing unusual sensations at times, lasting a few seconds; however, the [Plaintiff] reported that she noted no change in her level of consciousness or her ability to interact with the environment (*Id.*). Dr. Brightman stated that such "nonspecific very brief spells" are not clearly seizure activity. The [Plaintiff] was noted to be doing well on her current regimen of Tegretol.

A year later the [Plaintiff] continued to be seizure free (Ex 23F: 13). At that time[,] she did not report any type of seizure activity, including no discussion of the brief spells she previously mentioned. After a normal EEG in November 2011, she was tapered off the anti-seizure medication (Ex 23F: 13 and 26F: 10). The [Plaintiff] did not return to her treating neurologist, William Mayr MD, until May 2014, well after the end of the relevant period (*see* Ex 26F).

[Plaintiff] reported episodes of "spacing out." However, [ ], she did not report these episodes after October 2010 and was eager to be getting off her anti-seizure medication a year later (*see* Ex 23F: 13). Furthermore, the record shows that the [Plaintiff] reported that such episodes of "transient loss of awareness" began in June 2014, a year and a half after the end of the relevant period (Ex 19F:9-10). Notes state that she stopped her anti[-]epileptic medication at the end of 2011 and remained seizure free until experiencing five such episode in June 2014 (Ex

3

> 19F:11). Thereafter, however, in September 2014, she reported not having experienced any further episodes (*Id.*).
>
> In addition, the [Plaintiff] injured her back during a grand mal seizure in July 2008 and suffered a herniated disc, supported by MRI (Ex 19F:4). She complained of severe right leg pain thereafter and, ultimately, underwent a right L5-Sl discectomy in April 2009 (Ex 2F:21, 33; *see also* Ex 23F:5). Notes around that time indicate that she had been leading an active life and was limited only since the fall and resulting back injury (Ex 2F:22).
>
> After the surgery the [Plaintiff] continued to have some hip pain. She was referred for physical therapy and prescribed Celebrex (Ex 5F:7). Thereafter, however, her complaints continued regarding her low back pain and further stated that her pain radiated to the legs bilaterally. She reported having "no real problem" when walking and no numbness, tingling or weakness, but pain in the right buttock radiating to the knee when she sits (Ex 19F:5). However, an MRI of the lumbar spine showed only some degenerative changes at L5-Sl with no focal disc protrusion or herniation (Ex 23F:7, *see also* Ex 5F: 17). Dr. Brightman noted that there may be inflammation along the right L5 nerve root and that selective nerve root injections might help and also prescribed Neurontin and Daypro (Ex 23F:8). The [Plaintiff] received an epidural steroid injection in October 2009 (Ex 17F:1). Due to ongoing pain complaints, however, an x-ray was performed that revealed severe degenerative disc disease at L5-S1 (Ex 17F:5). She then returned to physical therapy with a diagnosis of hypermobile coccyx the following month (Ex 36F:8). She again noted that pain increases with sitting and activity. The record shows that the [Plaintiff] continued to have pain. She testified that she now utilizes two different pads when sitting as well as when standing, which is corroborated by the record (*see* Ex 8F).
>
> Turning to the [Plaintiff]'s mental health concerns, the record documents that she suffered a trauma in 2002, leading to a diagnosis of PTSD (Ex 22F). She was ultimately release from active duty in the military and noted as being "unable to handle the emotional stress this incident has caused" (Ex 22F: 1). While there are no counseling notes during the relevant period relating to the PTSD or other mental health condition, the record does document mental restrictions resulting for the combined effect of all her conditions, both physical and mental.

(Tr. 30–32).

### C. The ALJ's Decision

The ALJ found that Plaintiff last met the insured status requirement through December 31, 2012, and did not engage in substantial gainful employment during the period from her alleged onset date of September 4, 2007, through her date last insured of December 31, 2012. (Tr. 26).

4

The ALJ determined that through the date last insured, Plaintiff had the following severe impairments: history of brain tumor with resection; seizure disorder; degenerative disc disease L5-S1, hypermobile coccyx; and posttraumatic stress disorder (PTSD). (*Id.*). The ALJ, however, found that, through the date last insured, none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (Tr. 27).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ found that:

> After careful consideration of the entire record, [the ALJ] find[s] that, through the date last insured, the [Plaintiff] had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with certain restrictions. Specifically, the [Plaintiff] can occasionally climb ramps and stairs but can never climb ladders, ropes or scaffolds. She can occasionally balance, stoop, kneel, crouch and crawl. She can never work at unprotected heights or with moving mechanical parts, and can never operate a motor vehicle. The [Plaintiff] can perform simple, routine tasks, but not at a production rate pace. She can make simple work-related decisions. She can frequently interact with supervisors, coworkers and the public. She is able to tolerate few changes in a routine work setting.

(Tr. 29).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence and other evidence in the record for the reasons explained in this decision." (Tr. 30).

As for the relevant opinion evidence, the ALJ found,

> In April 2006, about five months prior to the start of the relevant period, the [Plaintiff] underwent a neuropsychological evaluation of her current cognitive status (Ex 33F). She reported cognitive slowing, diminished concentration and decreased memory, which she stated began prior to her first seizure but worsened while on antiepileptic medication. After a full evaluation, the examiner, Laura Pennel Samson PsyD, summed up testing results as being most notable for diminishment in speeded concentration and attention, cognitive slowing in particular for complex information processing and some decreased efficiency in learning and memory (Ex 33F:2). Dr. Samson recommended that the [Plaintiff] employ strategies such as a daily plan and a to-do list and work in a setting with fewer demands on free recall (Ex 33F:3). I give some weight to Dr. Samson's

5

opinion. Although it was drafted shortly before the relevant period, later evidence and the overall weight of the record indicates that the [Plaintiff]'s condition did not improve. The residual functional capacity assessment addresses the [Plaintiff]'s noted difficulties by limiting her to simple, routine work activities.

There are no relevant treatment notes regarding her cognitive issues during the relevant period. However, in December 2016, four years after the end of the relevant period, the [Plaintiff] underwent another a partial consultation for cognitive problems with Mary Hill PhD (Ex 39F). There are no records of follow up to complete the consultation. I note, however, that the [Plaintiff] reported to Dr. Hill that her cognitive symptoms began to increase in 2013, also after the end of the relevant period. Dr. Hill does not forward an opinion regarding the [Plaintiff]'s capabilities.

In November 2015, the [Plaintiff] underwent another neuropsychological assessment with Julie D. Simensky PhD (Ex 7F). Testing demonstrated relative weakness in memory and executive functioning (Ex 7F:4). Dr. Simensky opined that the pattern of the [Plaintiff]'s cognitive impairment is most likely attributable to the combined neurological impact of the surgical resection of her cavernoma and her epilepsy (Id.). The [Plaintiff] was said to experience slowed cognitive processing speed, reduced working memory skills and mildly reduced memory abilities leading to significant problems with performing cognitive tasks simultaneously. Dr. Simensky opined that the [Plaintiff] would do best in a setting that is structured, organized and minimally distracting, focusing on one task at a time (Ex 7F:5). As this opinion statement was made several years after the end of the relevant period, I give it little weight. However, as it is generally consistent with the prior neuropsychological assessment administered in 2006, I find it warrants some consideration.

There is a statement dated December 2018 from Cynthia A. Salwan LISW, who treated the [Plaintiff] from April 2006 through November 2006, which is before the start of the relevant period (Ex 32F). Ms. Salwan's statement is based on her "best recollection" as the actual treatment records had already been destroyed. Ms. Salwan reported that the [Plaintiff] exhibited low mood and energy, sleep disturbance and difficulties with concentration. She stated that the [Plaintiff]'s neurological condition and psychological issues were interfering with her ability to do her job and with her attendance at work. Little weight is assigned to Ms. Salwan's opinion as it is based purely on her own personal recollection of her history of treating the [Plaintiff] for only seven months 12 years prior.

The State Agency medical file consultants initially found insufficient evidence to find any severe impairments. However, based on subsequent records, upon Reconsideration the [Plaintiff] was limited to medium exertional work activity due to her spine problems. The consultants found insufficient evidence once again regarding the mental impairments. I give little weight to the State Agency medical file consultants as the evidence available at the hearing level warrants greater

limitations, both physically and mentally.

(Tr. 32–33).

Relying on the vocational expert's testimony, the ALJ concluded that through the date last insured, Plaintiff was unable to perform her past relevant work as a receptionist, advertising representative, and a secretary, but she could perform other light exertional jobs that exist in significant numbers in the national economy such as a cashier, cleaner/housekeeper or sales attendant. (Tr. 34–35). He therefore concluded that Plaintiff was not disabled within the meaning of the Social Security Act, at any time from his alleged onset date of September 4, 2007, through December 31, 2012, the date last insured. (Tr. 35).

## II.     STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence,

7

it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### III. DISCUSSION

Plaintiff alleges the ALJ made a number of wide-ranging errors which, taken together, necessarily require remand. (*See generally* Doc. 16). Despite the number of specific errors alleged, at base, Plaintiff is arguing that the ALJ's RFC determination is not supported by substantial evidence. (*Id.*). Separate from these "substantial evidence" arguments, Plaintiff also alleges that the ALJ erred at Step 5 by failing to establish that there is other work available in the national economy that she can perform. (*Id.*). Defendant rejects each error alleged, arguing that "Plaintiff has failed to show any error in the ALJ's findings, and instead relies on her own assertions of subjective statements and limitations in a bid to have this court reweigh the evidence." (Doc. 17 at 1). Upon review of the ALJ's decision and the administrative record as a whole, the Court agrees with Defendant.

#### A. Substantial Evidence

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The Social Security regulations, rulings, and Sixth Circuit precedent provide that the ALJ is charged with the final responsibility in determining a claimant's residual functional capacity. *See, e.g.*, 20 C.F.R. § 404.1527(d)(2) (the final responsibility for deciding the residual functional capacity "is reserved to the Commissioner"). And it is the ALJ who resolves conflicts in the medical evidence. *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). In doing so, the ALJ will give each opinion the weight deemed appropriate based on factors such as whether the physician examined or treated the

8

claimant, whether the opinion is supported by medical signs and laboratory findings, and whether the opinion is consistent with the entire record. 20 C.F.R. § 416.927(c). The ALJ may reject an opinion that is inconsistent with the record. 20 C.F.R. § 416.927(c)(4); *Gant v. Comm'r of Soc. Sec.*, 372 F. App'x 582, 585 (6th Cir. 2010). Nevertheless, substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010).

Plaintiff alleges the ALJ's RFC determination is not supported by substantial evidence because he failed to evaluate the sworn statements of family members as to Plaintiff's activities of daily living. (Doc. 16 at 1, 4). Specifically, she alleges that the ALJ should have "consider[ed] these reports and weighed them considering the 'nature and extent of the relationship' and consistency with the evidence." (*Id*. at 4 (quoting SSR 06-3p)). Plaintiff's claim is without merit.

The ALJ did in fact consider and weigh the statements from Plaintiff's family. (*See* Tr. 30 ("I have also considered opinion evidence in accordance with 20 C.F.R. 404.1527."); Tr. 32 (recognizing that "[t]he record contains three third party statements . . . from [Plaintiff's] sister, mother and husband" but finding that each statement is "not wholly supported by the weight of the record during the relevant period")). While the regulations mandate the ALJ consider, as part of his RFC analysis, statements submitted by family, such statements are entitled to weight only where they are supported by the record. *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004); *Maloney v. Comm'r of Soc. Sec.*, 480 F. App'x 804, 810 (6th Cir. 2012). As detailed above, the ALJ did consider these third-party statements and determined they were inconsistent with the record. (Tr. 32 ("I have considered [the] third-party statements as part of the evidence of record, [and] I assign them little weight as they are not supported by the medical record.")). Considering

9

this, the Court finds the ALJ did not err in his evaluation of the sworn statements of Plaintiff's family members as to her activities of daily living.

Next, Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence because the hypothetical questions he asked to the VE "did not accurately portray her mental or physical impairments." (Doc. 16 at 12). Specifically, she alleges that while the ALJ found Plaintiff's PTSD to be a "severe impairment," he failed to state any limitation for it in the hypothetical to the VE. (*Id*. at 4). The Court similarly finds this claim without merit.

"[T]he existence of a severe impairment says nothing as to its limiting effects." *Simpson v. Comm'r of Soc. Sec.*, No. 1:13-CV-640, 2014 WL 3845951, at *9 (S.D. Ohio Aug. 5, 2014) (citing *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)); *see also Corley v. Comm'r of Soc. Sec.*, No. 98-3785, 1999 WL 970306, at *1 (6th Cir. Oct. 14, 1999) ("The ALJ did not err in finding that a severe impairment can exist without also finding that a significant limitation and disability exist . . . The severe impairment threshold is separate from (and lower than) the disability threshold."). The ALJ did not err by not including a limitation for Plaintiff's PTSD in his hypothetical to the VE, because he previously determined that the limitations opined in Plaintiff's own testimony, and that offered by her family, contradicted record evidence. (*See* Tr. 30–32). Specifically, the ALJ found that this testimony was "unreliable" given that it covered a time period six years before the relevant disability period. (Tr. 32 ("As the period before me is quite remote, ending more than six years ago, it is uncertain how reliable such recollection are without corroborating records.")); *see also Kingery v. Comm'r of Soc. Sec.*, 142 F. Supp. 3d 598, 602 (S.D. Ohio 2015) ("To be relevant to the disability decision, '[p]ost-expiration evidence must relate back to the claimant's condition prior to the expiration of her [impairment].") (quoting *Wirth v. Comm'r of Soc. Sec.*, 87 F. App'x 478, 480 (6th Cir. 2003)). Given that the ALJ was not required to include

a limitation for Plaintiff's PTSD in the hypothetical to the VE, even though he found that impairment "severe," Plaintiff's claim here does not hold water. Furthermore, as detailed above, the ALJ engaged in a thorough analysis of the record evidence regarding Plaintiff's PTSD during the relevant time period, which included only lay opinion testimony, and concluded that these opinions were not consistent with the medical evidence. (*See* Tr. 30–32). The ALJ, therefore, did not err here.

Plaintiff further alleges the ALJ's RFC determination is not supported by substantial evidence because he "mischaracterized evidence" and the RFC "[c]ontains material errors of fact." (Doc. 16 at 1). She argues the ALJ made a "factual error" in determining that "during the relevant period [Plaintiff's] headaches did not cause her more than minimal limitations regarding her ability preform basic work activities." (*Id*. at 7; Tr. 27). Defendant disputes this claim, arguing that "[d]espite [Plaintiff] pointing out some parts of the record where her migraines were documented, it was clear from the treating neurologist's longitudinal notes that these headaches were not severe and that they were controlled with medication." (Doc. 17 at 11). Upon review of the ALJ's opinion and the corresponding medical evidence, the Court finds no "factual errors." Even more so, the record clearly reflects that Plaintiff's migraines were not a problem and when they were, her symptoms were successfully treated. (*See* Tr. 281 (noting that Plaintiff's migraines were "[r]eadily controlled" with medication as needed); *see also* Tr. 909, 911 (noting that Plaintiff's migraines were "not a problem at present")).

Plaintiff similarly argues that the ALJ made a "factual error" by making no finding "as to the role of menses as an exacerbating factor to her migraines." (Doc. 16 at 7). Defendant, however, correctly notes that the ALJ did in fact consider Plaintiff's allegation that she generally experienced headaches "before and after her menses cycle." (Doc. 17 at 12 (citing Tr. 30)). As with Plaintiff's

previous allegations, the ALJ appropriately considered the role of menses as an exacerbating factor to her migraines and again found that these subjective complaints were not supported by the record. (Tr. 30–32, 248–59 (discussing Plaintiff's testimony and third-party evidence relating to her menses and migraines, and finding that these allegations where not supported by the record)). Furthermore, the ALJ found that the medical evidence describing Plaintiff's menses as an exacerbating factor, were not provided during the relevant period and were therefore assigned little weight. (Tr. 32–33, 562–66, 1005–07, 1154); *see also Kingery*, 142 F. Supp. 3d at 602.

Plaintiff's arguments that the ALJ should have reached another conclusion regarding her migraines and menses are of little consequence. Even if this Court would have decided the case differently, it must give deference to the ALJ and affirm her findings if substantial evidence supports them. *Bradley v. Sec'y of Health and Human Serv.*, 862 F.2d 1224, 1228 (6th Cir. 1988). Because substantial evidence supports the ALJ's analysis and conclusion here, there is no error.

Plaintiff continues by arguing that the RFC determination is "internally inconsistent" because while the ALJ identified several moderate mental limitations at Step 3, he did not include any such limitation in the RFC. (Doc. 16 at 6–7). For this reason, Plaintiff asserts, the RFC is not supported by substantial evidence. (*Id.*). In making this argument, however, Plaintiff misunderstands an ALJ's responsibilities at Step 3. As Defendant properly argues, because "the ALJ's inquiry is necessarily broader during the RFC assessment and accounts for all relevant evidence, the ALJ could not have erred simply by not incorporating findings at Step 3 into the RFC assessment." (Doc. 17 at 10 (citing *Taylor v. Colvin*, No. 1:14CV1710, 2016 WL 760399, at *13 (N.D. Ohio Feb. 26, 2016) ("[T]he ALJ in the instant case did not err in failing to include specific limitations relating to Plaintiff's social functioning in his RFC even though he found moderate limitations in social functioning in his paragraph B criteria at Steps 2 and 3.")). Here,

the ALJ's decision to not include any limitations reflecting the "moderate" limitations caused by Plaintiff's mental impairments in the RFC, is not an error even though he identified such limitations in the Paragraph B criteria at Steps 2 and 3. In fact, the ALJ even identified this difference and detailed why it did not result in internal inconsistency. (*See* Tr. 29 ("The limitations identified in the Paragraph B criteria . . . are not a[n] [RFC] assessment but are used to rate the severity of mental impairments at steps 2 and 3 . . . "); *see also Tiggelman v. Comm'r of Soc. Sec.*, No. 1:18-CV-1402, 2019 WL 5232812, at *4 (W.D. Mich. Sept. 17, 2019) (finding no error where the ALJ "expressly stated that his RFC finding reflects the degree of functional limitation that he found under paragraph B").

Ultimately, Plaintiff asks this Court to re-weigh the evidence relating to her impairments and decide the outcome of this case differently. This request is impermissible under the substantial evidence standard of review. The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. *Bradley*, 862 F.2d at 1228; *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Young v. Sec'y of Health and Human Servs.*, 787 F. 2d 1064, 1066 (6th Cir. 1986). Accordingly, because the ALJ's RFC determination is supported by substantial evidence, and Plaintiff's assignment of error has no merit.

### B. Step 5 Analysis

Finally, Plaintiff alleges that the ALJ erred at Step 5 by failing to establish that there is other work available in the national economy that she can perform. (Doc. 16 at 6–7). Specifically, she argues that "two of the occupations [opined] require frequent interactions with the public, coworkers, and supervisors[,]" which fails to take into consideration Plaintiff's combined severe and non-severe impairments. (Doc. 20 at 5). Defendant contends otherwise, arguing Plaintiff's claim is "irrelevant" because she can perform at least one of the three jobs the vocational expert

13

identified. (Doc. 17 at 8–9). Because "Plaintiff could still work a job that the vocational expert identified . . . [she] has failed to show any error in the ALJ's reliance on this job, existing in significant numbers, with the assessed social limitations." (*Id*. at 9).

At step five, the ALJ has the burden of demonstrating that a significant number of jobs in the national economy exist that the claimant can perform, given his or her residual functional capacity, age, education, and past work experience. 20 C.F.R. § 404.1520(a)(4)(v), (g); 20 C.F.R. § 416.920(a)(4)(v), (g); 20 C.F.R. §§ 404.1560(c), 416.960(c) (2019); *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008). The Commissioner may meet this burden by relying on the VE's testimony to determine what jobs exist in significant numbers in the economy that the claimant can perform considering the combination of his or her limitations. *See, e.g., Fry v. Comm'r of Soc. Sec.*, 476 F. App'x 73, 76 (6th Cir. 2012); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004).

Here, the VE testified that an individual with Plaintiff's RFC could work a number of occupations, including Cashier, Cleaner/Housekeeper and Sales Attendant. (Tr. 35). The ALJ opined, "[t]hese [jobs] are evidence of a 'significant number' of jobs to which the claimant can be expected to make a successful vocational adjustment." (*Id*.). Plaintiff alleges that because two of these jobs two require frequent interactions with the public, coworkers, and supervisors, the ALJ's Step 5 determination is inconsistent with Plaintiff's impairments, specifically her PTSD. (Doc. 20 at 5). However, "even if this restriction is not accurately portrayed in the ALJ's RFC finding, it is entirely consistent with the unskilled jobs the ALJ relied on." *Cissner v. Berryhill*, No. 3:16-CV-00121, 2017 WL 3821461, at *10 (S.D. Ohio Sept. 1, 2017); *see also* See DOT § 323.687-014 (cleaner, housekeeping), 1991 WL 672783 (establishing that this occupation has 140,000 positions in the national economy and a "not significant" rating with respect to "people").

14

Accordingly, even if the Court were to accept Plaintiff's argument that she should work in an environment with limited interaction with others—a limitation not included in the RFC—Plaintiff could still work a job that the vocational expert identified, which exists in significant numbers in the economy. *See Taskila v. Comm'r of Soc. Sec.*, 819 F.3d 902, 905 (6th Cir. 2016) (holding that the existence of 6,000 jobs in the national economy was sufficient to sustain the Commissioner's burden at step five).

Considering that the VE's testimony supported that Plaintiff could perform one of the three jobs identified by the ALJ for which a significant number of jobs existed in the national economy, his erroneous citation to the other two jobs was at most harmless error. *See, e.g., Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 158 (6th Cir. 2009). Therefore, the Court finds that the VE's testimony constitutes substantial evidence to support the ALJ's finding at Step 5.

## IV.    CONCLUSION

Based on the foregoing, the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner's decision.

IT IS SO ORDERED.


Date:   July 19, 2021                              /s/ Kimberly A. Jolson
                                                   KIMBERLY A. JOLSON
                                                   UNITED STATES MAGISTRATE JUDGE